WILLIAM W. GOODMAN et al., Commissioners of Goodwyn Institute, Appellees, v. STATE OF TENNESSEE, Trustee, Appellant. —351 S. W. (2d) 399.

Western Section. December 23, 1960.

Certiorari Denied by Supreme Court May 5, 1961.

Petition to Rehear Petition for Certiorari
Denied by Supreme Court May 26, 1961.

George L. McCanless, Attorney General, and Jack Wilson, Assistant Attorney General, Phil M. Canale, Jr., District Attorney General, and William H. Williams, Assistant Attorney General, for State.

Abe L. Roberts, Memphis, amicus curiae.

Montedonico, Boone, Gilliland, Heiskell & Loch; Armstrong, McCadden, Allen, Braden & Goodman, Memphis, for appellees.

AVERY, P.J. (W.S.) In this cause the original complainants, William W. Goodman, Howard Tayloe and Albert M. Austin, Jr. are the Commissioners of Goodwyn Institute under the will of William A. Goodwyn, deceased, last dated 1898 and by virtue of the action of the State of Tennessee through the General Assembly and the order of the Governor, and these complainants who are appellees in this cause will be referred to in this opinion as "Commissioners".

The State of Tennessee as Trustee under the aforesaid will, a defendant below and appellee in this Court, will be referred to hereinafter in this opinion as the "State". Phil M. Canale, Jr. District Attorney General 15th Judicial Circuit of the State of Tennessee, a defendant below and appellant in this Court will be referred to as "District Attorney".

Abe L. Roberts and James A. Anderson who unsuccessfully sought to intervene in the Court below as de-

98

fendant, and who have filed the motion in this Court to be permitted to intervene as defendants, which has by the Court been denied, but Abe L. Roberts has been permitted to file a brief in the cause as Amicus Curiae will be referred to as "unsuccessful intervenors".

The Commissioners entered into a contract, subject to such action of the General Assembly of the State of Tennessee as may be necessary, with the First National Bank, through proper deeds and conveyances to exchange the lot and building known as the Goodwyn Institute Building located at the corner of Madison Avenue and Third Street in the City of Memphis and generally known as 165 Madison Avenue, for its lot and building at the corner of Second Street and Madison Avenue and known as 127 Madison Avenue, and to the end that said contract may be legally consummated it became necessary to have a declaration by decree of the Courts in which at least certain portions of the will of William A. Goodwyn, deceased, is construed, the authority of the Commissioners declared, and for a full determination of the matters set forth in said will. That portion of the prayer thereto seeking declaration of the Court is in the following words and figures:

"(2) By construction of the Will of Wm. A. Goodwyn and by declaration of powers granted thereby, the Court order, adjudge, decree and declare that Commissioners under the Will of Wm. A. Goodwyn, deceased, and, on their request, the State of Tennessee, Trustee under the Will of Wm. A. Goodwyn, deceased and, on their request, The State of Tennessee, Trustee under the Will of Wm. A. Goodwyn, deceased, are authorized and empowered to:

"(a) Consummate and perform the Contract between the First National Bank and Goodwyn Institute, dated January 29, 1960, Exhibit E to this Bill, for exchange of the properties there described and described in this Original Bill, under the terms and conditions stated in such Contract;

"(b) Maintain Goodwyn Institute Library and Goodwyn Institute Lectures, under the control of Commissioners, with identity intact, at locations in Memphis, Tennessee other than the building from which Commissioners are receiving rental income known as Goodwyn Institute Building and to offer Goodwyn Institute Lectures by suitable media serving the Memphis public; in connection with which library and lectures Commissioners are authorized to enter into contracts, expend funds of Goodwyn Trust and to take all action necessary or appropriate to further the objects and purposes of the Will of Wm. A. Goodwyn.

"(3) By construction of the Will of Wm. A. Goodwyn, deceased, and by declaration of powers granted thereby, the Court order, adjudge, decree and declare that Commissioners under the Will of Wm. A. Goodwyn, deceased, are authorized and empowered from time to time to hold and manage all personal property of Goodwyn Trust, to sell any such property, in the discretion of Commissioners, and to invest and reinvest such property in such securities or other property legal for investment of trustees by the law of Tennessee as Commissioners may, from time to time, determine.

"(4) The Court grant Commissioners such other or further relief to which they may be entitled."

The State answered the bill by its Attorney General, George F. McCanless and in that answer the formal parts of the bill are admitted, including the identity and the interest of all the defendants, source of title to the involved properties but all issues or other allegations are traversed with the following statement in that answer:

"The defendant, State of Tennessee, traverses the remaining allegations in the bill in order to put them at issue. The defendant submits the rights and interest of the State of Tennessee in the subject matter of the suit to the protection of the Court."

The District Attorney answered the bill likewise admitting the formal statements contained therein, and by traversing all issues or allegations of sought relief, with the following statement:

"The defendant Phil M. Canale, Jr., traverses the remaining allegations in the bill in order to put them at issue and submits the rights and interest he represents in the subject matter of the suit to the protection of the Court."

All the parties to the suit agreed, in writing, and filed same as a part of the record, on August 29, 1960, that the case be heard on oral testimony. Following the filing of that agreement the case was heard and the written opinion of the Chancellor filed approving the relief sought. Decree embracing the opinion by reference and granting the relief sought was entered on September 9, 1960.

On October 3, 1960, Abe L. Roberts and James A. Anderson filed intervening petitions seeking to be made

parties to the suit, as defendants, which aver that the petitions were tendered on August 29, 1960, and which show the action of the Court thereon in the following words:

"The Court: Now gentlemen, the two petitions (of which movant's was one) to intervene, or whatever they may be termed, will be denied.

"You (being with reference to movant) are not a party to this lawsuit under the ruling which the Court has just made."

The trial Court permitted the incorporation of these petitions in the record now before this Court, and he also permitted the said Abe L. Roberts, who is an attorney at law, to examine certain witnesses, both on direct and cross-examination, and in fact to participate as a counsel in the examination of witnesses. These petitions of these Unsuccessful Intervenors sought to have the Court amend his findings, open the cause for further proof and that they be permitted to examine such witnesses as they desired and put their proof into the record. By a former decree or order these petitions were argued and heard before the Court and on October 12, 1960, he entered an order formally denying such intervention and in that order he said:

"There may be other good reasons why these petitions should be denied, but the three reasons which the Court has in mind are these:

"(1) The attempted filing of these petitions and the attempted intervention comes too late;

"(2) No special interest has been shown to the Court which would justify or authorize the filing of these petitions;

"(3) The District Attorney General, and in fact, the State of Tennessee, are made party defendants to these suits, and the District Attorney General is charged more or less as guardian of the trusts such as these, and charged with the duty and obligation of protecting the interests of the body politic, as the Court considers he is attempting to do in this case."

He then decreed in accord with the above quote at which time these Unsuccessful Intervenors prayed an appeal to this Court, which was denied and exceptions saved.

Now in this Court, as stated hereinbefore, these Unsuccessful Intervenors below have filed motion to be permitted to intervene here and have the case remanded to the Chancery Court of Shelby County for further proof. This motion is formally denied, after hearing argument by counsel for intervenors, Roberts representing himself and Mr. Anderson, but in so denying the relief sought by that motion, the Court said to Mr. Roberts that he might file a brief as Amicus Curiae or friend of the Court, and allowed him sufficient time so to do, and he has filed such a brief. That brief has been carefully examined and all it does is simply to seek to have this Court reverse its order overruling the motion to permit such intervention and furnishes to this Court no authority whatever to aid it in a proper determination of the issues presented by the record. Therefore, there will be no further reference made to that brief, or the petition to intervene, other than to say that the District Attorney saved the exceptions which these intervenors had made to the decree of the lower Court refusing them permission to intervene and in so doing protected their rights, and for which

action on the part of the District Attorney he is entitled to commendation from this Court.

The questions presented to this Court by this record are as follows:

1—What was the dominant purpose of deceased Goodwyn for the creation of the trust he sought to establish and did establish in accord with the provisions of his will?

2—Do the Commissioners, acting under the authority of the trust imposed in them have a right to consummate, by execution of all necessary deeds the contracts and agreements made with the First National Bank for the exchange of the properties sought to be so transferred?

3—Do the Commissioners, acting under the trust imposed upon them by the provisions of said will, have a right to operate, for the benefit of the public, the Goodwyn Institute library in some other building than that, title to which is vested in the State by the terms of said trust?

4—Do the Commissioners have a right to conduct the lecture courses provided by said trust to be held in some other building separate from that, title to which is now or hereafter may be vested in the State, as provided by the terms of said trust?

5—Is the proposed property exchange and method of conduct suggested by the Commissioners for the performance of their duties under the terms of said trust reasonably feasible and economical?

That part of the will of testator Goodwyn from which the funds were derived with which the lot and building

known as Goodwyn Institute were purchased and built is in the residuary clause of the will, and that part which sets forth the dominant purpose in the mind of the testator for the establishment of Goodwyn Institute are both found in Section 14 of the will. The learned Chancellor has so aptly said:

"Those portions of the Will of Mr. Goodwyn considered most material for the disposition of the issues of this cause, extracted from Section 14 of the Will, are as follows:

" 'All the balance of my estate, real, personal or mixed, including at the death of Myra McGavock, that given to her in Section 11, during her life, excepting that part of the personalty or mixed which I allow her to will or give away), I give after the death of my wife to the State of Tennessee, as Trustee for the following uses and purposes, and none other. I will and desire that the State, upon the nomination of the Governor, to be confirmed by the Senate, appoint three Commissioners to be known as 'Commissioners of Goodwyn Institute', and said Commissioners will hold their office for four years, and until their successors are reappointed and qualified; the said Commissioners are to purchase a suitable lot in the City of Memphis (now taxing district) in Shelby County, Tennessee, and erect suitable buildings thereon, expending therefor such parts of this gift as to them may seem proper, and retaining the balance for library and apparatus, expenses and endowment fund, * * *. The title to the lot purchased and all other property shall be in the name of the State for the purposes of this trust solely.

The Building or buildings to be erected shall be satisfactory to said Commissioners, but such portion thereof as can be shall be.rented for the purpose of obtaining a revenue for the maintenance of a public library and public lectures. One part of said building shall be devoted to lectures and another part a library, and the use of the library shall be free to all under the rules and regulations to be made by said Commissioners; and the lectures shall be free and the whole will be for instruction and not entertainment merely. All of the rents, profits and income derived shall be faithfully used and applied, together with any part of this legacy not used in purchasing or building (after payment of repairs, expenses, insurance, et cetera) to pay lecturers and the purchase of books, charts, maps and apparatus. * * *

" 'My whole wish and desire as respects this "Goodwyn Institute", is to afford to the future youths who may desire information upon such practical and useful subjects as will be beneficial in life, * * *. If the State of Tennessee should refuse to take charge of this trust then I direct my executors to carry out my wishes as expressed, as to them may seem best after consultation with my friends, Judge E. H. East, John M. Lea and J. M. Dickinson, all of Nashville, Tennessee. I will that the portraits of my wife and myself and the pictures of my children, now in my dwelling in Nashville, be hung in this "Goodwyn Institute", to which I will them.' "

He then has referred to Chapter 353 of the Acts of 1903 of the General Assembly of the State of Tennessee, with which the Courts in this cause are concerned and

from his opinion the Act is quoted as follows:

"Be it further enacted, that at the end of each four years as designated in said will, the Governor of the State is authorized and required to nominate and appoint three successors to the Commissioners originally nominated, appointed and confirmed, which successors shall also be confirmed by the Senate, and in like manner, if any vacancy occurs in said commission during any period of four years by the death, resignation, or removal from the State, of any one of said Commissioners, the Governor may fill such vacancy for the unexpired term of such Commissioner by appointment subject to confirmation by the Senate; that by the acceptance of the trust created by the aforesaid will, the State of Tennessee does not assume the custody of the funds and property thereby devised and bequeathed; neither does it assume responsibility for the care and preservation thereof; and the executors of the said testator are accordingly authorized, empowered and directed to pay over the funds and moneys to be paid over, pursuant to the terms of the said will, to the Commissioners hereafter named and appointed by the Governor as the Commissioners of the Goodwyn Institute, instead of to the State of Tennessee."

Since the passage of said Act the Commissioners have been appointed from time to time as provided by said trust provisions and they have set out in their bill what they consider to be the dominant purpose of said trust and they maintain that the consummation of the contract will enable them and their successors to operate an expanded free Goodwyn Institute library and more exten-

sive Goodwyn-Institute lecture series, not alone from what they conceive increase in income which the consummation of the contract would provide, but more particularly in the lecture series would permit them to expand their lecture series by the modern means of transmitting information by radio and television to the public throughout the whole area served by such facilities within and without the city of Memphis.

The learned Chancellor has well answered our Question No. 1 with the following extract from his opinion:

"While the Will contains expressions of Mr. Goodwyn relating to the location of library and lecture hall facilities in the Goodwyn Institute Building, such expressions do not define the dominant intention of Mr. Goodwyn which relates not to the physical location of the library and lecture hall but to the benefits to be derived by the beneficiaries of the Goodwyn Trust from the use of the library and attendance at the lectures. This dominant intention is summed up by Mr. Goodwyn in his Will in the following language:

" 'My whole wish and desire as respects this 'Goodwyn Institute', is to afford to the future youths who may desire information upon such practical and useful subjects as will be beneficial in life'."

The reason for locating the Goodwyn Institute in the City of Memphis, Tennessee, was well fixed in the mind of Mr. Goodwyn, the testator. Immediately following the above quote from his will which shows his dominant purpose, he said:

"My reason for locating it in Memphis is, it was there I spent much of my life in the happy circle of

wife and children. The latter sleep near her borders, as I and my wife expect to do when we die. Here I made the friends of my early life; many of them are dead, but their descendants, many of them remain in Memphis and were playmates of my children, and to them or their descendants I hope this gift may be of great benefit. This legacy for the benefit of my old home has long been though of by myself and my wife and took shape in a will written by me in November, 1887, and now repeated. It became necessary to write this will on account of necessary changes, and to destroy that of 1887, and I mention this fact in order that my old friends at Memphis may know I have long cherished this idea. If the State of Tennessee should refuse to take charge of this trust then I direct my executors to carry out my wishes as expressed, as to them may seem best after consultation with my friends, Judge E. H. East, John M. Lea and J. M. Dickinson, all of Nashville, Tennessee.''

So that it is clear from the above quote that the testator,—the benefactor on behalf of the people, and especially the children or young folk of Memphis, Tennessee, directed the situs for the Institute, — not necessarily located upon any particular lot or parcel or land which might be purchased with the funds available to the Commissioners from the residue of his estate, but that it be located within the corporate limits of the City of Memphis.

As most people who perform a philanthropic service or arrange for such a benefit, he wanted it known by the name he gave it, ''Goodwyn Institute'', and in the build-

ing to be owned by the State for the purpose of the trust, he specifically directed that the portraits of his wife, himself and his children, all of which children were deceased at the time of the execution of the will, be placed in the building so that the people of that day and future generations might understand who their benefactors were, and so the sentence immediately following the last above quote is as follows:

"I will that the portraits of my wife and myself and the pictures of my children, now in my dwelling in Nashville, be hung in this 'Goodwyn Institute' to which I will them."

While the provisions with respect to the location of Goodwyn Institute in the City of Memphis and that of placing the portraits of his wife, himself and his children in the building known as Goodwyn Institute, are specific requirements respecting the duties and authority of the Trustees, and are mandatory, they are mere adjuncts to the dominant purpose for which the trust was created and the dominant purpose is clearly stated by the testator.

It will be observed that no where in the will is there any prohibition of sale by the Commissioners,—with consent of the State, against selling any property constituting any portion of the corpus trust investment, nor is there any prohibition against exchanging such property for other property in order that the dominant purpose of the trust might be carried out. He did provide that "one part of said building shall be devoted to lectures and another part a library", both of which were to be free to the public, but these expressions should not prevent the Commissioners from carrying out the dominant purpose

as expressed by the testator in accord with all modern methods of communication and dissemination of information, even though such methods were not known to the testator, and the general expression by him of his dominant purpose as set out in the Will carries with it an implied direction to the Commissioners to provide for such free lectures and free use of the library by such means as would give the beneficiaries of his philanthropy the greatest use of such free services.

While there is some objection shown by the proof of witnesses to the plan announced by the Commissioners to place the Goodwyn Institute Library in a building now occupied by the Cossitt library, at least pending the day when the State will come in possession of the present First National Bank lot and building, and to conduct the lectures in other adequate buildings than in the present First National Bank building, these objections do not afford any legal reason to prohibit such action on the part of the Commissioners, nor do they prevent the Commissioners from displaying at whatever location they may place the Goodwyn Institute Library, such designation as will give the public notice that it is the Goodwyn Institute Library, nor from displaying, at the place where the lectures may be had, such designation as will clearly show the public that these lectures are Goodwyn Institute Lectures, all of which it will be the duty and responsibility of the Commissioners to do. That is to say, furnish three places where the insignia so required to be posted will furnish that information at each rather than merely at one Goodwyn Institute Building.

In the presentation of the proof in this cause men of a great deal of real estate experience over a long period of

years ranging as high as more than 25 years within the City of Memphis and who testified well established by preponderance of the respective properties in question and it is well established by preponderance of the proof that the value of the First National Bank property sought to be exchanged for the Goodwyn Institute property is approximately one and one-half times that of the Goodwyn Institute property, or in a relationship of a fixed value on the building and lot of the First National Bank of $1,000,000 and on the Goodwyn Institute building and lot of $650,000. These witnesses were also engaged in supervision of rental services of real estate through their respective connections, and the proof predominates by a great preponderance in their conclusions that the First National Bank is a more modern building than that of the Goodwyn Institute building and that it's rental value far exceeds that of the Goodwyn Institute building, both by oral testimony and the audits which are exhibited with this record, the relationship of rental income preponderates in favor of the First National Bank building.

There is also much proof relative to the condition of the Goodwyn Institute building when the present management by the Commissioners took charge and the way and manner that they have conducted their duties and responsibilities under the trust and the problems which confront them in the future if they are to give maximum service which the trust requires to the public.

There is also a preponderance of proof in the record to the effect there are auditoriums in the business area of the City of Memphis, as well as within the areas away from the main business section, but within the municipality, that can afford more convenience for free

lectures than either the First National Bank building or the Goodwyn Institute building. Real estate men, educators, managers of television services and stations, testified to the advantage afforded the Commissioners in the performance of their duties under the trust, if the contract is consummated as contemplated, and without quoting the figures from the proof which bear out the conclusions set forth in this opinion, which we have read carefully and have studied the proof in connection with the opinion of the learned Chancellor and his final decree, it is clear to us that the proof does not preponderate against the decree of the Chancellor, but that the preponderance of the proof clearly sustains his decree.

It is shown by this opinion that the District Attorney is the only appellant, but that he has preserved, in his assignments of error, the contention made by the Unsuccessful Intervenors along with his other assignments, all of which are as follows:

"Assignment of Errors

"I.

"The Chancery Court erred in authorizing and empowering Commissioners to consummate and perform the contract of January 29, 1960 between Goodwyn Institute and The First National Bank for exchange of properties.

"This was error because such exchange is not authorized by the Will of Wm. A. Goodwyn.

"II.

"If Chancery Court is correct is authorizing and empowering Commissioners to consummate and per-

form written Contract of January 29, 1960, between Goodwyn Institute and First National Bank for exchange of properties, the Court erred in not requiring Commissioners, as directed in Will, to house library and lecture hall in First National Bank Building or 'some suitable building on some suitable lot in Memphis, Shelby County, Tennessee'.

"This was error because the language of Testator in the Will is crystal clear and should be mandatory upon Commissioners and Trustee.

### "III.

"The Chancery Court erred in authorizing and empowering Commissioners to maintain Goodwyn Institute Library and Goodwyn Lectures, at locations in Memphis other than the building from which Commissioners are receiving rental income and to offer Goodwyn Institute Lectures by suitable media serving the Memphis public.

"This was error because such manner of maintenance is not authorized by the Will of Wm. A. Goodwyn.

### "IV.

"The Chancery Court erred in not allowing Petitioners to intervene in the Cause.

"This was error because the Petitioners were beneficially and legally interested in the object of the suit."

Counsel for the respective parties have prepared excellent briefs of the facts, as shown by the record and of the law governing the issues involved.

We take from an exhibit to the original bill and in the proof a "Comparison of Property to Be Exchanged Under Contract", which it is deemed proper to show in this opinion this comparative compilation, for we think that the proof unquestionably preponderates to substantiate the conclusions of this compilation which is as follows:

"Some pertinent comparisons between the properties to be exchanged under Contract are:

|  | Goodwyn Building | Bank Building |
|---|---|---|
| "Lot Size | 74.25' x 148.5' | 74.25' x 148.5' |
| Constructed | 1907 | 1910 |
| Additions | 1924 | 1925, 1930 |
| Distance from Main Street | 2 Blocks | 1 Block |
| Height | 7 Stories (Excluding Basement) | 18 Stories (Excluding Basement & Mezzanine) |
| "Total net rentable area | 35,056 sq. ft. | 60,247 sq. ft. |
| Estimated rental values: |  |  |
| Annual Gross (including in Goodwyn Building owner occupied space) | $105,900.00 | $204,716.92 |
| Net after expenses (including real estate taxes, but before depreciation) | $ 51,550.00 | $ 86,573.57 |
| Actual gross rental fiscal year ended 4/30/50 | $ 62,420.79 | . . . . . . . . . . |
| Fire and extended coverage insurance (actual) | $1,300,000.00 | $1,917,000.00 |
| Book Values | $ 240,374.00 (4/30/50) | $1,003,961.00 (3/2/60 Income Tax) $ 750,000.00 (3/2/60 statement) |
| Fair Market Value (Real Estate Expert Estimate) | $ 650,000.00 | $1,000,000.00" |

We see no necessity here to refer to all the exhibits, however, they are referred to by designation in the briefs and are found in the record.

There is much said in the record about converting certain floors of the Bank Building to space for the li-

brary and an auditorium for the lecture courses, and it is contended by the Commissioners and supported by the proof, that if such were done the advantages of the contract to Goodwyn Trust would be materially curtailed, the income otherwise available to Commissioners considerably less, and the primary purpose of Goodwyn Institute would be materially reduced for the reasons that the rental income from this valuable space in the bank building and the loss on the investment which would be necessary to remodel the Bank Building in order to construct such facilities would be permanent, and would thereby prevent the use of the funds derived from rent of this valuable space in the Bank Building to further the dominant purpose expressed in the Will. No appreciable rent could be had from the lecture auditorium and the rent to be had from the floor or floors which might be converted to auditorium purposes would greatly offset the rent for lecture space elsewhere.

There is contention made that the disadvantage to the Goodwyn Institute is that it would have no income from either building pending the occupancy of the Bank Building by the First National Bank for the four year period before there will be a physical exchange of management, and possession thereof by the Goodwyn Institute Commissioners.

The proof is rather clear that with the arrangement proposed to place the library in a separate building and the conduct of the lecture courses in a separate building, together with the cost of the operation thereof, can be paid from the net balance now in the hands of the Commissioners, which is shown will be somewhere near $100,000 after the consummation of the proposed con-

tract, and if such services will be comparable to that which the Goodwyn Institute Commissioners have heretofore carried on, and that with the expiration of the possession by the Bank of the Bank Building, this increased income from the rental property will fully offset any curtailment of revenue and at that time an expanded operation of library service and lecture service can be immediately introduced.

We agree with such reasoning, as did the learned Chancellor.

The Commissioners for legal authority in behalf of their contentions, as did the learned Chancellor, reply principally upon the case of Henshaw et al. v. Flenniken et al., 183 Tenn. 232, 191 S. W. (2d) 541, 543, 168 A. L. R. 1010. In that case, after making the bequest by which he devised lands to his wife for life, provided further:

"* * * and at her death I direct that the title to all my lands with all the appurtenances thereto, be and vest in the Trustees of Immanuel Baptist Church, at Vestal, Knox County, Tennessee, but said lands shall not be sold or title parted with by said Trustees of said Immanuel Baptist Church, but said lands to be kept and rented or leased and the profits thereof to be used in furthering the work of said Church, in paying the expenses of said Church, and in raising funds for Foreign, Home and State Missions for the Missionary Baptist Church."

In the course of time the Trustees filed a bill to sell said real estate and use the proceeds for what they deemed the dominant purpose set forth by the will, and in that bill they said:

"* * * conditions have greatly changed since the will was made, which changes the deceased could not foresee; and because of the fact that the church and complainants, its trustees, cannot afford to spend the money necessary to properly develop and improve the property and make it profitable; that the proceeds of sale can be used to a better advantage in furthering the interest of the church in paying expenses and in raising funds for foreign, home, and state missions."

The prayer of the bill sought authority to sell the said property and for the direction by the trustees in the expenditure of the funds derived therefrom, and furthermore without requiring the Trustees to reinvest any part of the proceeds in real estate.

The opinion of the Henshaw case was written by the recently retired Chief Justice Neil for our Supreme Court in 1945. It is here noted that the Will in that case forbade the sale of the trust real estate, and in the opinion Judge Neil said two questions were involved, namely:

(1) Does the restraint upon the sale and transfer of title to this property create a perpetuity that is forbidden by law?

(2) Has a court of equity, in the exercise of its inherent jurisdiction, authority to authorize the sale of said lands on the ground that under the facts and circumstances it is for the best interest of all parties and would more effectively contribute toward carrying out the real wishes of the devisor?

Obviously we are not concerned, in the instant case, with question No. 1, but we are concerned with his answer

to question No. 2. We might say, however, that while he held that the trustees were without authority, except with power from a court of equity, to sell the property against which an express restraint of sale had been laid, yet even in such cases there was abundant authority for a Chancery Court to order a sale of such property. He further said:

"In holding that a court of equity may order a sale of property held for a charitable use, the intention of the devisor is held to be of paramount importance."

He further commented upon the fact that the Will did not provide for a reversion to his estate nor to allocate particular parts of the income in a definite way to different church purposes, "but his thought was to aid this church in all of its varied activities", and referred to the fact that changes had been brought about which the testator could not foresee.

The same case was back before the Court on a petition to rehear, and the same then presiding Judge wrote the opinion on that petition. As we understand this opinion and the authorities upon which it is based, and which are numerous, though it seems unnecessary to cite them except by reference to this case, we think the rule in Tennessee might be stated as follows:

That the means and/or details for the administration of charitable trust should be molded so as to meet any exigency which may be disclosed by a change of circumstances so as to relieve the trust from conditions which imperils or endangers the charity trust or the funds provided for its endowment and maintenance and to fur-

ther the dominant purpose for which the trust was established, are natural and necessary branches of equitable jurisdiction.

This opinion of our then learned Chief Justice and the rules laid down therein are fully annotated in 168 A. L. R. beginning at page 110, and the authorities of other jurisdictions support the opinion.

Certainly great changes, as heretofore indicated, have taken place since the execution of the Will establishing the trust here involved was probated, and since the erection of the building known as the Goodwyn Institute building in Memphis. The people of this country are now mostly urbanites or suburbanites and most everybody has access to modern methods of communication, transportation and transmission of information.

At the time that this trust was established the travel for any distance was by train. The transportation and dissemination of news was as slow as the trains themselves for the newspapers were then carried between cities and towns only by train. There was no such thing as radio or television. Mr. Goodwyn understood, as did all others who lived at that time, that quick access to a library or to a lecture series could only be had by the people who lived near to the point where the library was kept or the lecture series performed. Thus, having lived within the City of Memphis, and desiring to bring this library service and lecture service to the young folk particularly, he made these young people living in the City of Memphis the object of his benefaction. No doubt he had in mind that the establishment of such facilities would not only be enlightening, but would furnish a sort of different entertainment from that which was then

generally available. Even public amusements or other types of entertainment now available everywhere did not exist. The corporate area of the City of Memphis has greatly increased since the establishment of this trust, while the record does not show, it perhaps is more than three times as large as existed at that time. The population of the City of Memphis at that time, according to the Federal census, was only 102,320 and now it is practically five times that number. If this greater population in his greatly expanding area are to have the benefit of the full purpose for which he established this charitable trust the dissemination and availability thereof to the people must be in accord with the progress of the present day and carried by the facilities available, not only when the trust was established, but now. Lecture series in the City of Memphis are now available to people living within 100 miles of the City, for transportation by the use of automobiles over paved roads has made it possible to leave home and drive this distance in two hours or less. The same is true for research in a library, and the lecture series can reach thousands of people by television many miles from the auditorium where the lectures are given. So it seems, that what the Commissioners seek is to give the best possible service which the donor intended and thus performing their responsibilities to the public, who is the benefactor of such philanthropy by one of those worthy deceased citizens in this present day and society.

Without further setting out the facts found by the learned Chancellor, either as set forth in the 19 points as a sort of preamble to his decree, which elaborates upon the meaning of the dominant purpose of the testator, and his finding of facts as set forth in his prepared

memoranda, we can find no more choice expressions to put into a decree which will further the purpose of this charitable trust then that of the learned Chancellor when he said:

"It Is, Therefore, by the Court Ordered, Adjudged, Decreed and Declared that:

"(1). Complainants, or the then acting Commissioners of Goodwyn Institute under the Will of William A. Goodwyn, deceased, and on their request, the State of Tennessee, Trustee under the Will of William A. Goodwyn, deceased, by requisite implementation, are authorized and empowered to:

"(a) Consummate and perform the Contract between The First National Bank of Memphis and Goodwyn Institute, dated January 29, 1960 for exchange of the properties there described in this Decree, under the terms and conditions stated in such Contract;

"(b) Maintain Goodwyn Institute Library and Goodwyn Institute Lectures, under the control of Commissioners, with identity intact, at locations in Memphis, Tennessee other than the presently owned or any subsequently acquired building or buildings from which Commissioners are receiving rental income, whether or not known as Goodwyn Institute Building; and to offer Goodwyn Institute Lectures by suitable media serving the Memphis public; in connection with which library and lectures such Commissioners are authorized to enter into contracts, expend funds of Goodwyn Trust and to take all action necessary or appropriate to further

the objects and purposes of the Will of William A. Goodwyn;

"(2) Complainants, or the then acting Commissioners of Goodwyn Institute under the Will of William A. Goodwyn, deceased, are authorized and empowered from time to time to hold and manage all personal property of Goodwyn Trust, to sell any such property in the discretion of such Commissioners and to invest and re-invest such property in such securities or other property legal for investment of trustees by the law of Tennessee as such Commissioners may, from time to time, determine;

"(3) Compainants, or the then acting Commissioners of Goodwyn Institute under the Will of William A. Goodwyn, deceased, are authorized and empowered to pay all necessary and reasonable expenses incident to the consummation of the Contract between The First National Bank of Memphis and Goodwyn Institute;

"(4) The costs of this cause be paid by complainant commissioners out of the trust funds in their hands."

We, therefore, have answered the questions involved, as we see it, overruled all assignments of error, denied the intervention sought, feeling that the public has been fully cared for by the defense, explanation and efforts on the part of the Attorney General of the State of Tennessee, the District Attorney and adopt the foregoing judgment of the Chancery Court, as quoted in this opinion last above, as the decree of this Court, which decree

we consider is supported by this opinion both factually and legally.

Carney and Bejach, JJ., concur.

## Supplemental Opinion

AVERY, P.J. (W.S.). Since this opinion was prepared, and on this the 22nd day of December 1960, the Honorable Abe L. Roberts, Amicus Curiae, has filed an "amended brief" and also what he terms "assignment of errors." With this document he has also offered exhibits which nowhere appear in the record below which came to this Court, consisting of photographs and articles from the Atlanta Journal of December 13, 1959. These photographs appear to be photographs of portions of the Goodwyn Institute Library and of the Goodwyn Institute Auditorium as now located in the Goodwyn Institute Building. While this document comes entirely too late to be considered, we have examined it and insofar as it affects the involved issue, the opinion as prepared, we think, covers the questions which could be properly raised, if in fact Unsuccessful Intervenors had succeeded in getting permission of the Courts to intervene.

Carney and Bejach, JJ., concur.